## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Dan J. May
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Briane M. House
R. Daniel Faust
House Reynolds & Faust, LLP
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jamie Lynn Vore, <br> *Appellant-Respondent,* <br><br> v. <br><br> Jeffrey Lee Vore, <br> *Appellee-Petitioner* | February 15, 2016 <br><br> Court of Appeals Case No. 34A02-1505-DR-264 <br><br> Appeal from the Howard Superior Court <br><br> The Honorable Brant J. Parry, Judge <br><br> Trial Court Cause No. 34D02-1201-DR-86 |

**Robb, Judge.**

# Case Summary and Issues

[1] Jamie Vore ("Mother") and Jeffrey Vore ("Father") were divorced in 2013. Mother received primary custody of the couple's minor child ("Child"), and Father was ordered to pay child support. Thereafter, Mother filed a petition to modify child support, and Father filed a petition to modify support, custody, and parenting time. After a hearing, the trial court modified custody, awarding primary custody to Father. In addition, the trial court modified Father's child support obligation effective as of the date of Mother's petition, ordered the arrearage be paid into a trust for Child, and terminated Father's child support obligation effective immediately. Mother appeals, raising several issues for our review, which we consolidate and restate as: 1) whether the trial court abused its discretion in modifying child custody; 2) whether the trial court abused its discretion when calculating Father's income for child support purposes; 3) whether the trial court abused its discretion in terminating Father's child support obligation; and 4) whether the trial court abused its discretion in ordering Father pay his arrearage into a trust for Child. As to the first three issues, we conclude the trial court did not err. However, we also conclude the trial court abused its discretion in ordering Father pay the arrearage into a trust for Child. We therefore affirm in part and reverse in part.

# Facts and Procedural History

[2] On June 11, 2013, the trial court issued a written decree dissolving Mother's and Father's marriage. As a part of the decree, the trial court awarded Mother

primary custody of Child, and Father was awarded parenting time with Child every weekend and for one-half of Child's summer break from school. The trial court also ordered Father to pay $100 per week in child support. Nearly a month later, Father won $1,000,000 in the Hoosier Lottery. After paying taxes on his winnings, Father received around $540,000.

[3] On July 8, 2013, less than a week after Father won the lottery, Mother filed a petition to modify child support. Mother later filed a Supplemental and Second Petition to Modify Support and Father filed a petition to modify child custody, support, and parenting time.

[4] On March 9, 2015, the trial court heard argument on the parties' petitions. Child submitted to an *in camera* interview where she indicated a desire to live with Father. Two weeks later, the trial court entered its findings of fact and conclusions—made at Mother's request—awarding Father primary custody, modifying Father's child support obligation to $259 a week retroactive to July 8, 2013, terminating Father's child support obligation to Mother, and ordering Father to pay the arrearage into a trust for Child. Mother now appeals. Additional facts will be added as necessary.

# Discussion and Decision

## I. Standard of Review

[5] "Modifications of child custody, parenting time, and child support are all reviewed for abuse of discretion. We grant latitude and deference to our trial

judges in family law matters." *Miller v. Carpenter*, 965 N.E.2d 104, 108 (Ind. Ct. App. 2012) (citations omitted). On appeal, we neither reweigh evidence nor reassess witness credibility. *Id.* Rather, we consider only the evidence most favorable to the judgment and the inferences flowing therefrom. *Id.*

[6] Where, as here, the trial court issues findings of fact and conclusions at the request of one of the parties, we apply a two-tiered standard of review. *Maddux v Maddux*, 40 N.E.3d 971, 974 (Ind. Ct. App. 2015). First, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* The trial court's findings are controlling unless the record includes no facts to support them either directly or by inference. *Id.* Legal conclusions, however, are reviewed de novo. *Id.* at 975. We set aside a trial court's judgment only if it is clearly erroneous. *Id.* at 974. "Clear error occurs when our review of the evidence most favorable to the judgment leaves us firmly convinced that a mistake has been made." *Id.* at 974-75.

## II. Child Custody

[7] Mother argues the trial court's decision to modify custody was clearly erroneous. Specifically, Mother contends the trial court erred in failing to take into account Father drinks alcohol and Child only wanted to live with Father because Father was less strict. Father argues Mother's position invites us to reweigh the evidence, and in any event, the findings supports the trial court's determination. We agree with Father.

[8] A court may not modify a child custody order unless the modification is in the best interests of the child, Ind. Code § 31-17-2-21(a)(1), and there is a substantial change in at least one of the following factors:

(1) The age and sex of the child.
(2) The wishes of the child's parent or parents.
(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
(4) The interaction and interrelationship of the child with:
    (A) the child's parent or parents;
    (B) the child's sibling; and
    (C) any other person who may significantly affect the child's best interests.
(5) The child's adjustment to the child's:
    (A) home;
    (B) school; and
    (C) community.
(6) The mental and physical health of all individuals involved.
(7) Evidence of a pattern of domestic or family violence by either parent.
(8) Evidence that the child has been cared for by a de facto custodian . . . .

Ind. Code § 31-17-2-21(a)(2); Ind. Code § 31-17-2-8. The court shall also consider these factors in determining whether the modification is in the best interests of the child. Ind. Code § 31-17-2-21(b).

[9] Here, the trial court heard evidence of Mother's and Father's wishes, and the trial court conducted an *in camera* interview with Child. In its order, the trial court made the following relevant findings of fact:

1. Jeffrey Vore and Jamie Vore are the parents of one (1) minor child, . . . age 15.

* * *

7. [Father] lives in a three bedroom home by himself. The child has her own bedroom in the home.

* * *

9. [Mother] lives in [a] three bedroom home with 5 other individuals. [Mother's two] children . . . reside in the home. [Mother's] boyfriend, Bob Reed, resides in the home. Tasha Allen . . . resides in the home. "Kim", age 21 and not related to [Mother], also lives in the home.

10. "Kim" lives with [Mother] because she is homeless. "Kim" is bi-polar and [Mother] helps her with her medication.

* * *

13. [Child] attends Kokomo High School. Until this school year, [Child] had done very well academically. However, on her last grading period, [Child] received two very poor marks.

14. [Child's] teachers have told [Mother] that [Child's] failure to complete her homework is her main problem at school. [Mother] has indicated that she is unable to assist [Child] with her homework due to the difficulty of the subject matter. Similarly, [Father] is also unable to assist [Child] with her homework.

* * *

17. [Mother] has not been employed since 2009. In 2009, she was involved in an automobile accident and was injured. She applied for disability, but was denied. She has not applied for employment within the last six months.

18. [Mother] receives food stamps.

19. [Mother] and her boyfriend both smoke cigarettes in the home and around [Child]. She has caught [Child] smoking cigarettes in the recent past.

20. When [Child] misbehaves, [Mother] punishes [Child] by taking away her cell phone, sending her to her room, or removing the door to her room.

21. [Child] has a boyfriend. [Mother] does not allow the boyfriend in her home. [Mother] will not allow this because she suspects sexual activity, and is trying to stop it. [Child]

continually attempts to see her boyfriend against [Mother's] wishes.

22. [Father] allows [Child] to see her boyfriend in his home. [Father] does not allow the children to be alone. He provides constant supervision. [Father's] rules concerning the boyfriend conflict with [Mother's] rules as to the boyfriend.

* * *

25. [Father] drinks alcohol, specifically beer, on a daily basis. Throughout a week, [Father] may consume between 2-4 cases of beer. He drinks around and in front of [Child]. There is no evidence that [Child] has ever consumed alcohol and [Child] indicates that she is a non-drinker.

26. When [Child] misbehaves, [Father] disciplines her by sending her to her room or sitting her down and talking to her.

* * *

32. [Child] has a loving relationship with [Father]. [Child] feels comfortable talking with her father about issues in her life. They enjoy cooking and going on motorcycle rides together.

* * *

34. [Child] has a loving relationship with [Mother]. However, [Child] does not feel comfortable talking with her mother about life issues.

* * *

36. [Child] does not have a good relationship with [Mother's] boyfriend, Bob Reed.

37. [Child] does not have a good relationship with "Kim". [Child] moves to a different room in the home or to her bedroom to avoid being the room [sic] with "Kim".

38. [Child] does have a good relationship with Tasha Allen.

39. [Child] has a good relationship with her sister . . . . However, [Child] does not feel comfortable talking to [her] about issues in her life or obtaining advice from her.

* * *

41. [Child] indicates that she wishes to live with [Father].

* * *

45. Since the previous custody order was entered, there have been several substantial changes in circumstance:

    a.  [Child] is older;
    b.  [Father] now wishes to have [Child] live with him;
    c.  [Child] now wishes to live with [Father];
    d.  [Mother] has additional individuals that live in her residence;
    e.  [Mother] is now dating Bob Reed;
    f.  [Child's] grades have declined during the last school year;
    g.  [Father] won the lottery.

Appellant's Appendix 13-17. In modifying the child custody order, the trial court concluded,

> 71.  The Court believes that both parties love their children a great deal.
> 72.  The child is older at the time of this hearing than she was at the time of the dissolution.
> 73.  [Father] now wishes to have the child in his custody.
> 74.  [Mother] has at least 2 other people living in her residence than she did when the dissolution was granted.
> 75.  The child's grades have dropped during the last grading period.
> 76.  The child now wishes to reside with [Father].
> 77.  The court finds and concludes based on all evidence submitted, the record, and findings above, that [Father] has met his burden to show a change in circumstances so decisive as to make a change in custody necessary and in the [Child's] best interest.

*Id.* at 20.

[10]   As noted above, the trial court made specific findings as to how much alcohol Father drinks and how strict each parent is regarding Child's boyfriend. Mother's arguments invite us to reweigh the evidence, which we will not do.

*See Miller*, 965 N.E.2d at 108. In addition, we conclude the evidence supports the trial court's findings and the findings support placing Child in Father's custody. Although the trial court made numerous findings supporting its conclusion in this regard, we note the trial court found fifteen-year-old Child desired to live with Father, *see* Ind. Code § 31-17-2-8(3); Child did not feel comfortable communicating with Mother, but felt comfortable communicating with Father, *see* § 31-17-2-8(4)(A); and Child did not get along with multiple individuals living with Mother, some of whom moved in after the dissolution decree, *see* § 31-17-2-8(4)(C). Accordingly, the trial court did not abuse its discretion in granting Father's petition to modify custody of Child.

## II. Child Support

### A. Income for Child Support Calculation

[11] Mother argues the trial court erred when it calculated Father's modified child support obligation. Specifically, Mother contends the trial court erred in calculating the net portion of Father's lottery winnings instead of his total winnings. "Weekly Gross Income is the starting point in determining the child support obligation, and it must be calculated for both parents." Ind. Child Support Guideline 3(A) Commentary 2.

> For the purposes of determining the parents' income in the child support guideline calculation, the definition of 'weekly gross income' is broadly defined to include not only actual income from employment, but also potential income and imputed income from 'in-kind' benefits. However, the Commentary to the Indiana Child Support Guidelines cautions that determining

income is more difficult when commissions and other forms or irregular income are involved. While irregular income is includable in the total income approach taken by the Guidelines, the determination is very fact sensitive.

*Harris v. Harris*, 800 N.E.2d 930, 939 (Ind. Ct. App. 2003) (internal quotation marks and citations omitted), *trans. denied*.

[12] In *Harris*, a noncustodial father obtained a custody modification, and the mother appealed, arguing the trial court erred when it included only the net portion of the father's wrongful termination settlement. The father received a final gross settlement check of $800,000, but after deductions for taxes, attorney's fees, and investments, the only money available to the father was $189,570.33. Instead of using the $800,000 figure to calculate the father's weekly gross income, the trial court used the $189,570.33 figure. We affirmed the trial court's decision, reasoning,

> The nature of a settlement award is a one-time payment of money. As such, it has a single impact on an individual's financial circumstances and net worth. It is reasonable to state that the award would have ultimately benefited the children if the family had remained intact. Even then, the settlement award would have only been beneficial after the appropriate taxes were deducted.
>
> Therefore, we agree with the trial court that the gross amount of the settlement award was an irregular and non-guaranteed form of income, which the trial court, in its discretion, could exclude from its determination of gross income. Here, the trial court considered the settlement award and concluded that it was reasonable to include the net portion, as only that amount would

have been available to the family. This decision ensured that the children are given the support they need.

*Id.* at 940 (internal citations and footnote omitted).

[13]     Here, the trial court concluded,

> 65. The lottery winnings were irregular and non-guaranteed income. [Father] was required to pay state and federal taxes on the entire $1,000,000.00 award. The net amount, $540,000.00, is the amount that would have actually been available to the family. * * *
>
> 67. Through his employment at Omni Source, [Father] earns gross income of $34,000 per year. For the last four years, [Father] has earned $136,000.00 in gross income from Omni Source. During that time, [Father] received $540,000.00 in net lottery winnings. The total amount of income over the four year period equaled $676,000.00. That amount of income breaks down to $169,000.00 per year and $3,250.00 per week.
>
> 68. Pursuant to the attached Child Support Obligation Worksheet, [Father's] support obligation is modified to $259.00 per week retroactive to July 8, 2013.

Appellant's App. at 19. Similar to *Harris*, Father received a one-time payment of a large sum of money, the net income was the only amount of money made available to Father, and the money had a single impact on Father's net worth. In addition, had the family remained intact, Father's net income from the lottery winnings would have ultimately benefited Child. *See Harris*, 900 N.E.2d at 940. Using its discretion, the trial court concluded the gross portion of the lottery winnings constituted an irregular and non-guaranteed form of income that should be excluded from the child support calculation. Accordingly, we

are not persuaded the trial court erred in calculating child support based on the net portion of Father's lottery winnings.

## B. Father's Future Child Support Obligation

[14] Mother argues the trial court erred in terminating Father's child support obligation. Pursuant to Indiana Child Support Guideline 3(F)(1),

> The total child support obligation is divided between the parents in proportion to their weekly adjusted income. A monetary obligation is computed for each parent. The custodial parent's share is presumed to be spent directly on the child. *When there is near equal parenting time*, and the custodial parent has significantly higher income than the noncustodial parent, application of the parenting time credit should result in an order for the child support to be paid from a custodial parent to a noncustodial parent, absent grounds for a deviation.

(Emphasis added). In other words, before a custodial parent can be ordered to pay child support to a noncustodial parent, two facts must be present: 1) the parents share near equal parenting time, and 2) there is a large disparity in the parent's incomes. Here, the trial court awarded Father primary custody of Child and concluded Mother "shall have the right to parenting time with the child pursuant to the Indiana Parenting Time Guidelines." Appellant's App. at 29. Indiana Parenting Time Guidelines Section II(E) sets forth the standard for a noncustodial parent's regular parenting time, which Mother concedes equates to around "98 overnights." Reply Brief of the Appellant at 29. If Mother's parenting time is estimated to be ninety-eight overnights, then Father's parenting time is estimated to be around 267 overnights. Because Mother and

Father do not share near equal parenting time, we conclude the trial court did not err in ordering no child support be paid by Father to Mother.

## C. Arrearage

Mother argues the trial court erred in ordering Father's arrearage be paid into a trust for Child's benefit in the future. One of the purposes of child support is to provide a child with regular and uninterrupted support. *Hicks v. Smith*, 919 N.E.2d 1169, 1171 (Ind. Ct. App. 2010), *trans. denied*. It is well-established the right to child support lies exclusively with the child. A custodial parent is therefore required to hold the support payments in trust for the child's benefit; in essence, the custodial parent becomes "the trustee of the non-custodial parent's obligation to pay . . . ." *Id.* Generally, the non-custodial parent maintains an ongoing obligation to pay child support, and the custodial parent maintains an ongoing obligation to care for the child. *Id.* at 1172. However, when a non-custodial parent does not maintain the ongoing obligation to pay, the "custodial parent who has advanced his or her own funds to provide food, clothing, and shelter to the child has discharged the trusteeship and 'is entitled to collect the arrears from the non-custodian.'" *Id.* (quoting *Lizak v. Schultz*, 496 N.E.2d 40, 42 (Ind. 1986)). This rule creates a presumption "that the custodial parent has made up any shortfall that resulted from the noncustodial parent's failure to fulfill his or her child-support obligations." *Sickels v. State*, 982 N.E.2d 1010, 1014 (Ind. 2013).

[16]     Here, the 2013 dissolution decree ordered Father pay $100 a week in child support. On July 8, 2013, Mother—after discovering Father won the lottery—filed a petition to modify child support. Father subsequently continued to pay Mother child support in the amount of $100 per week. In modifying the child support order retroactively, the trial court concluded,

> 68. Pursuant to the attached Child Support Obligation Worksheet, [Father's] support obligation is modified to $259.00 per week retroactive to July 8, 2013.
> 69. Based on this retroactive order, [Father] should have paid $23,051.00 in child support between July 8, 2013 – March 23, 2015 (89 weeks). [Father] has paid $8,900. Therefore, [Father] is $14,151.00 in arrears as to child support.
> 70. Child support is designed to ensure that *the child* maintains the standard of the living [sic] *the child* would have enjoyed had the marriage not been dissolved. Support is not designed to provide the custodial parent with a windfall. There has been no evidence that [Mother] expended any additional funds for the child since [Father] won the lottery. [Mother] and the child continued to live the same life style they had been living prior to [Father] winning the lottery. Therefore, the Court determines that this arrearage amount shall be placed in trust for the benefit of the child. [Father] shall place $14,151.00 in trust for the benefit of [Child] within the next 30 days. The trust funds may be used to finance the child's college education as needed. Once the child graduates college, the remaining funds, if any, shall be released to the child. If the child does not attend college, the funds shall be released to the child on her 22nd birthday.

Appellant's App. at 20 (emphasis in original). In other words, the trial court—in ordering the arrearage be placed into a trust for Child—solely relied on its findings that Mother did not present any evidence she expended any additional

funds to make up for the shortfall, and Mother and Child continued to live the same "life style." *Id.* This was error. The trial court's findings make no mention of Mother providing Child with food, shelter, clothing, and other basic necessities during the retroactive period, nor the general rule that a custodial parent is entitled to a presumption he or she made up any shortfall. *See Sickels*, 982 N.E.2d at 1014. It is neither Mother's burden to prove she made up any shortfall, nor Mother's burden to prove Child's life style changed.

[17] Despite its conclusion to the contrary, we note the trial court's findings support awarding the arrearage to Mother. Following the divorce, Mother was on food stamps, and Bob Reed, Tasha Allen, and "Kim" all moved into Mother's apartment. Child did not get along with Bob and "Kim" and Child's grades began to suffer. We find it likely none of this would have occurred had the family remained intact.

[18] Finally, our decision becomes clearer when viewed in light of the case's history. Father did not file his petition to modify custody, support, and parenting time until February 10, 2015, nearly nineteen months after Mother originally filed her petition to modify support; the trial court did not hear the matter until March 2015. Taking into consideration how long it took for the trial court to hear this matter, combined with the trial court being forced to hear Father's and Mother's competing petitions at the same time, we are convinced the trial court likely would have would have increased Father's child support obligation had the matter been heard closer to the time of Mother's filing and when Child was still in Mother's custody. Therefore, it is likely Mother would have had use of

the increase for the care of Child during that time, and any arrearages that accrued would have been awarded to Mother based on the law discussed above. Accordingly, we conclude the trial court abused its discretion by not ordering Father pay the arrearage to Mother.

# Conclusion

[19] The trial court did not abuse its discretion in awarding Father primary custody, calculating the modified child support obligation, and terminating Father's child support payments to Mother. We affirm the trial court's decision in those respects. However, the trial court abused its discretion in ordering Father pay the arrearage into a trust for Child; Mother is entitled to the arrearage and we therefore reverse that provision of the order and remand for the trial court to issue an amended order.

[20] Reversed and remanded.

Barnes, J., and Altice, J., concur.